IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| DAYNA LEE, as Administratrix of the Estate of RANDY THOMAS GROOM, Deceased,<br><br>    Plaintiff,<br><br>v.<br><br>DAVID SHANE RUSS, Individually, and CITY OF LAWRENCEBURG, TENNESSEE,<br><br>    Defendants. | Case No. 1:19-cv-00052<br><br>JUDGE CAMPBELL<br>MAGISTRATE JUDGE NEWBERN |

# MEMORANDUM

Pending before the Court is Defendant David Shane Russ's Motion for Summary Judgment. (Doc. No. 52). Plaintiff filed a Response (Doc. No. 68), and Defendant Russ filed a Reply (Doc. No. 69). Defendant Russ filed a Statement of Undisputed Facts (Doc. No. 54), to which Plaintiff responded (Doc. No. 69).

## I. BACKGROUND

Randy Groom lived in Lawrenceburg, Tennessee, nearly all of his life. (Doc. No. 69, ¶ 3). At the time of his death, he was 33-years-old, 5'8" tall, weighed 133 pounds, and suffered from an apparent mental illness. (*Id*., ¶¶ 1-2, 7). He threatened to commit suicide "all the time" and attempted suicide by carbon monoxide poisoning in 2015. (*Id*., ¶¶ 15-16).

On June 28, 2018, the night before his death, Groom spent the night with his ex-girlfriend Vanessa Aldridge. (*Id*., ¶ 19). Though they were no longer romantically involved, Aldridge allowed Groom to stay in her house periodically because he did not have anywhere else to go. (*Id*., ¶ 19). When he awoke the next morning, Groom asked Aldridge for money for his Suboxone

1

prescription and began "causing a scene" and "freaking out." (*Id*., ¶¶ 21, 23, 24). Without his medication, Groom would go through withdrawal. (*Id*., ¶ 24).

Groom left Aldridge's house around 10:00 a.m. and went to the Rite Aid on North Locust Street, where he was a known customer, to get a refill of his Suboxone prescription. (*Id*., ¶¶ 28, 32, 33). The pharmacy workers noticed Groom was carrying a large hunting knife in a sheath. (*Id*., ¶ 37, 44-49). When it came time for him to checkout, Groom grabbed the bag of medication and left the store without paying. (*Id*., ¶ 51-52).

Chief Pharmacist James Sullenger followed Groom into the parking lot to get a license plate number. (Id., ¶ 54). He tried to convince Groom to return to the pharmacy, but Groom refused and walked away. (*Id*. ¶ 54, 57). Sullenger said Groom was angry and still had the knife in his hand. (*Id*., ¶¶ 56, 58).

While Sullenger was outside with Groom, a pharmacy technician called 9-1-1. (*Id*., ¶¶ 65, 67-76). She told the dispatcher, "We just had a patient steal medication. He snatched it out of the pharmacist's hands. He has two knives, and he is currently out of the store." The technician identified the patient as "Randy Thomas Groom" and provided his age, 33, date of birth, and a description. (*Id*., ¶ 69-72). She described the knife as big, almost like some type of machete, and said that Groom had a second knife in his pocket. (*Id*., ¶ 73). She stated, "He is armed, yeah he is armed." (*Id*., ¶ 74). During the call, the technician spoke with Sullenger who added that Groom was walking "toward TSC" and did not have a car. (*Id*., ¶¶ 75-76).

The dispatcher advised the Lawrenceburg Police Department that a robbery had occurred at the Rite Aid. (*Id*., ¶ 77-78). She described the suspect as a white male with tattoos, wearing a white shirt and khaki shorts, and carrying a large knife. (*Id*., ¶¶ 79-81). She said the suspect was running across the road to Tractor Supply. (*Id*., ¶ 80). When asked for an updated description of

2

the suspect, the dispatcher repeated the description of the suspect, this time describing the knife as a "large machete." (*Id*., ¶ 84).

The dispatcher then advised the Lawrence County Sheriff's Office of the incident, giving the same description. (*Id*., ¶ 86). An officer advised that he was in the area and, upon confirming that the subject was Randy Groom, told dispatch to start EMS. (*Id*., ¶ 87-90).

Captain David Russ knew of Groom from previous interactions; as a child Groom was friends with Russ's stepson and Russ had seen Groom walking around the city "several times." (*Id*., ¶¶ 99, 150-51). When Russ heard the call over the radio, he responded to the area and began looking for Groom. (*Id*., ¶ 91, 97). Captain Russ saw Groom walking through a road between two stores in a Walmart parking lot. (*Id*., ¶ 101). Around the same time, Officer Jason Lee radioed that he saw a person matching Groom's description. (*Id*., ¶ 102). Russ advised Lee that it was in fact Groom.

Russ and Lee stopped at opposite entrances of the road between the stores and exited the vehicles – Russ at the north entrance, Lee at the south entrance. (*Id*., ¶¶ 103-05). At that time, neither officer knew that Groom was armed. (Russ Dep., Doc. No. 56-7 at PageID# 419-20 (Q: When you got out of your car, did you know Mr. Groom had a knife? Russ: When I stepped out, no.); Lee Dep., Doc. No. 56-9 at PageID# 437 (describing what he knew about Groom before the encounter: "he had robbed a pharmacy, and I was unaware if he had a weapon")).

Russ announced himself to Groom and told him they needed to talk. (*Id*., ¶ 108). Russ stated that, at that time, he did not see anything in Groom's hands. (*Id*., ¶ 107). After Russ announced himself and said they needed to talk, Groom reached for his waistband, lifted his shirt, pulled a large knife from a sheath in his shorts, and said to Russ, "Not today David." (*Id*., ¶¶ 109,

3

112-13). Lee drew his firearm when he saw Groom reach for his waistband. (*Id*., ¶ 110). When Groom pulled out the knife, Russ also drew his firearm. (*Id*., ¶ 114).

Both officers gave Groom several direct commands to drop the knife, but Groom ignored them and began walking toward Russ. (*Id*., ¶¶ 115-117). According to Lee, Groom was waiving the knife around and was yelling and agitated and being belligerent. (*Id*., ¶ 118). Groom continued to walk toward Russ with the knife in his hand, blade up. (*Id*., ¶ 119-20, 129).

When he was approximately 30 feet away from Russ, Groom stopped briefly. (*Id*., ¶ 125, 131). He continued yelling, repeatedly telling Russ to "shoot me." (*Id*., ¶¶ 126, 127). Lee stated that when Russ stopped, he was less belligerent; he had stopped waiving the knife around and was holding it at waist height. (Lee Dep., Doc. No. 56-9 at PageID# 452). After staying relatively stationary for approximately 25 seconds, Groom then took another step toward Russ, who fired a single shot, killing Groom. (*Id*., ¶¶ 134, 137).

The Investigative Report by Tennessee Bureau of Investigation ("TBI") indicates that there were several witnesses to the incident. One of these witnesses, Mike Pollock, recorded part of the incident on his cell phone. (*See* TBI Report, Doc. No. 56-10; Video, Doc. No. 59).

Russ testified that he felt threatened by Groom and was concerned for his safety and the safety of bystanders because he did not know what Groom was going to do with the knife. (*Id*., ¶ 122-23). The video of the incident shows Groom stop for approximately 25 seconds. During that time, he appears to be shifting his feet, but not moving in any particular direction. Then he takes a visible step toward Russ. (*See* Composite Video, Doc. No. 56 at 00:30:00 to 00:50:00).

Lee stated that from his position and what he could see, he could not justify the use of deadly force. (*Id*., ¶ 139; Lee Dep., Doc. No. 56-9 at PageID# 446). Lee said there would have been time to "engage him before he got to us" and that there was no one within a close enough

4

proximity that Groom could have thrown the knife. (Lee Dep., Doc. No. 70-2 at PageID# 626). He acknowledged that although he did not see Groom take a step, Groom was unsteady on his feet and it was possible he took a step. (Doc. No. 69, ¶ 138; Lee Dep., Doc. No. 56-9 at PageID# 445). Immediately after the shooting, Lee told another officer that he thought it could have been a "bad shoot." (Lee Dep., Doc. No. 56-9 at PageID# 449, 451 (alternatively testifying that he said it "was a bad shoot" or "could have been a bad shoot").

The Administratrix of Groom's estate claims Captain Russ used excessive force in violation of Groom's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States. Defendant Russ moved for summary judgment on grounds of qualified immunity.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). When facts relevant to a summary judgment motion have been recorded on a video, "to the extent that videos in the record show facts

5

so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). "To the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id*.

The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

### III. ANALYSIS

Captain Russ asserts the affirmative defense of qualified immunity. Qualified immunity protects government officials from civil damages "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Reich v. City of Elizabethtown, Ky.*, 945 F.3d 968, 977 (6th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The doctrine of qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id*. at 978 (internal quotations omitted) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). Once raised by the defendant, the plaintiff bears the burden to show qualified immunity does not apply. *Id*. The Court may address the prongs in any order. *Id*.

### A. Excessive Force

The constitutional right at issue here is the Fourth Amendment right to be free from excessive force during a seizure. *See Graham v. Connor*, 490 U.S. 386, 392 (1989); U.S. Const.,

6

amend. IV. Use of excessive force claims are analyzed under an objective reasonableness standard. *Id*. at 397. "This objective test requires courts to judge the use of force from the perspective of a reasonable officer on the scene, 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Reich*, 945 F.3d at 978. The Court evaluates the use of force through the eyes of an "objective reasonable officer at the scene," not with "the 20/20 vision of hindsight." *Id*. Whether force is objectively reasonable must account for the fact that "[p]olice officers routinely face 'tense, uncertain, and rapidly evolving' situations that force split-second judgments about the degree of force required." *Id*. With that in mind, "[a]n officer's use of deadly force is objectively reasonable if 'the officer had probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 392 (1989)).

In examining the totality of the circumstances, the Court considers: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham*, 490 U.S. at 392). The use of force is evaluated by focusing on those moments immediately before the use of force, not on any poor planning or bad tactics that might have "created the circumstances." *Id*. (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).

Finally, in considering the objective reasonableness of the use of force, the Court considers only the facts that were knowable to the officer. In this case, that means that the Court does not consider the details of the Rite Aid robbery. Russ testified that when he encountered Groom, he knew that Groom was suspected of armed robbery and carrying a machete. (Doc. No. 69, ¶ 92).

7

Russ also testified that he had seen Groom walking around town and that it was rumored Groom might have a mental illness. (Groom Dep., Doc. No. 70-1 at PageID# 615).

Considering the totality of the circumstances, there are questions of facts regarding the objective reasonableness of the use of deadly force against Groom. The first and third *Graham* factors weigh in favor of finding the use of force was reasonable. Although Groom had completed the crime when he was stopped by Russ and Lee, there is no dispute that Groom's actions in robbing the pharmacy constituted aggravated robbery, which is a serious crime. The third consideration, whether the suspect is resisting arrest or attempting to flee, is also present. When confronted by the officers, Groom drew a large knife from his shorts, waived it about, shouted at officers, and was belligerent.

The remaining consideration – whether the suspect poses an immediate threat to the safety of the officers or other – is arguably the most important of the three factors. It is with regard to this consideration – the immediacy of the threat – that the Court finds questions of fact.

Plaintiff does not dispute that Groom took a step toward Russ just before Russ fired his weapon. The video shows him clearly taking a step. Plaintiff asserts that the video also shows that Groom "did not pose a danger to anyone at the time he was shot." Taken in the light most favorable to the plaintiff, she contends the single step did not indicate an intent to hurt or run toward anyone. Plaintiff notes that the other officer on the scene concluded that Groom did not pose an immediate threat to the officers or others. (Doc. No. 68 at 8). The Court agrees that, viewed in the light most favorable to Plaintiff, the step Groom takes just before being shot appears casual and almost unintentional.

Lee testified that in the moments before Russ fired his weapon, Groom appeared to deescalate. (Lee Dep., Doc. No. 70-2 at PageID# 627). Lee stated, "From the time we made initial

8

contact, he de-escalated his demeanor towards us. And as far as yelling and screaming, he'd stopped yelling, he'd stopped screaming. He stopped walking, he had lowered the knife." (*Id*.). Lee stated that when Russ fired the shot, "I was really in shock because I didn't – I was not expecting the shot and I didn't see any reason for a shot to be fired from where I was standing." (*Id*. at PageID # 625). Lee stated that from his perspective, Groom was far enough away from the officers and bystanders that there would have been time to "engage him before he got to us." (*Id*. at PageID# 626).

With regard to the 30-foot distance between Groom and Russ, Defendant's expert stated that a reasonably fit adult male could cover that distance in approximately two seconds. (Doc. No. 56-11, ¶¶ 10-11). Indeed, there is no rule requiring officers to wait until a suspect is within striking distance before resorting to lethal force. *See Reich*, 945 F.3d at 982 (noting that a suspect could move 20 feet in "a second or two"). Nevertheless, most cases where the lethal use of force was found to be reasonable, the knife-wielding decedents were at a much closer distance than Groom was to Russ, Lee, or anyone else. *See e.g.*, *Reich* 945 F.3d at 980 (man armed with a knife approached to within five feet of the officer while "brandishing the knife in his outstretched hand"); *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 840 (6th Cir. 2018) (victim was holding a knife six to eight feet away from officers and made a move toward one of the officers); *Chappel v. City of Cleveland*, 585 F.3d 901, 910 (6th Cir. 2009) (victim was moving quickly toward officers with the knife held up at a distance of less than seven feet); *Rhodes v. McDaniel*, 945 F.2d 117, 118 (6th Cir. 1991) (victim raised his hand holding a knife and stepped towards officers, closing the distance to five to seven feet).

Of course, Lee did not have the same perspective on the situation as Russ. From his angle, Lee did not see Groom take the step that is clearly visible in one of the videos. In addition, Groom

9

was facing Russ and made a movement toward Russ. Even so, given that a second officer on the scene stated that he did not perceive an immediate threat, the Court cannot find that no reasonable jury could conclude Groom did not pose a serious threat to the officers or others at the time he was shot.

Accordingly, if this were the only step in the qualified immunity analysis, the question of whether there was a constitutional violation would be an issue for the jury. The second step in the analysis, however, causes the Court to reach a different result.

**B. Clearly Established**

The more difficult question is whether the right to be free from excessive force under these circumstances was "clearly established." To be "clearly established," the law must have been "sufficiently clear" such that "every 'reasonable official would understand that what he is doing' is unlawful."[1] *Reich*, 945 F.3d at 981 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). In other words, "existing case law, 'must have placed the statutory or constitutional question beyond debate.'" *Id*. (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Whether a law is "clearly established" cannot be defined at a high level of generality. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Specificity is particularly important in the context of excessive force "where it is sometimes difficult for an officer to determine how the relevant legal doctrine [] will apply to the factual situation the officer confronts." *Id*. (quoting *Mullenix v. Luna*, 136 S. Ct. 305,

---

[1] As the *Reich* opinion makes clear, the "clearly established" analysis occurs irrespective of whether summary judgment would be denied for the "excessive force" element. *Reich*, 945 F.3d at 981 (citing *Wesby*, 138 S. Ct. at 589, and *Kisela*, 139 S. Ct. at 1152). This Court must follow *Reich* even if completely divorcing the analysis of both elements from each other seems somewhat counterintuitive. Specifically, in a case such as the one here, where two officers on the scene arguably have differing views of whether "excessive force" was used, the applicable standard of "every reasonable official" places those differing views outside of the "clearly established" analysis.

10

308 (2015)). Accordingly, the Supreme Court has instructed that police officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Id*.

Plaintiff argues that in 2018 is was clearly established that an officer could not "shoot a person standing 30 feet away who is merely holding a knife and is not aggressively moving towards the officer or another person." (Doc. No. 68 at 14). Plaintiff argues that, viewing the facts in the light most favorable to the plaintiff, this case presents an "obvious case" in which any officer should know it is objectively unreasonable to use deadly force. (Doc. No. 68 at 15 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) and *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

The Court disagrees. While the decision in *Garner* and *Graham* establish the general legal standard regarding use of force, they are of little help to an officer trying to determine whether the use of lethal force is excessive under these particular circumstances.

Plaintiff also claims that the right at issue was clearly established by *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998), as recognized in *Studdard v. Shelby Cty., Tennessee*, 934 F.3d 478 (6th Cir. 2019). *Sova* and *Studdard* involved suicidal, knife-wielding, suspects who had already cut themselves. In both *Sova* and *Studdard*, the suspects ignored commands to put down their knives and were shot and killed by officers. Officers shot Studdard from about 34 feet away when he raised the knife to his own throat and moved forward in a swaying motion. *Studdard*, 934 F.3d at 481. There were no bystanders in the vicinity and Studdard had not made verbal threats to the officers or anyone else. *Id*.

In *Sova*, officers shot a suicidal, mentally unstable man in the doorway of his parents kitchen. 142 F.3d at 901. The man was carrying two butcher knifes, had cut himself, smashed windows in the house with the knives, and told officers that he wanted them to shoot him. *Sova*, 142 F.3d 898. The court denied qualified immunity, largely because there were "contentious

11

factual disputes," notably whether Sova threatened to get a gun and whether, at the time he was shot, he was charging through the kitchen door or merely standing in the doorway. *Id.* at 902.

Neither of these cases squarely govern the circumstances here. As the *Studdard* court noted, the suspects in both cases appeared to be causing only harm to themselves. In contrast, Groom removed the knife from his shorts and began waiving it around only after being confronted by officers. Although he yelled at the officers to "Shoot me," his actions brandishing the knife after being confronted by officers indicate an intent to harm persons other than himself. Moreover, the individuals in *Sova* and *Studdard* were not advancing toward officers or anyone else when they were shot. Groom, on the other hand, was advancing toward Russ, stopped for a brief time, and then took another step. Accordingly, the Court finds that neither *Sova* nor *Studdard* (even if it had been decided prior to the events in this case) would have caused every reasonable officer to understand that the use of lethal force was unlawful under the circumstances of this case.

Moreover, in light of *Reich*, the Court cannot find the unlawfulness of Russ's conduct was clearly established at the time. In *Reich*, the Court stated, "*Sova* and *Studdard* would not impress upon every reasonable officer the clear understanding that it is unlawful to shoot someone behaving like [the decedent] if that person is twenty-five feet away from one officer and thirty-six feet away from another." 945 F.3d at 982.

The circumstances in *Reich*, while not squarely on point, are more comparable to the facts of this case. In *Reich*, the court held that it was not clearly established in 2015 (approximately three years before the events in this case) that it was unlawful to shoot a "knife-wielding belligerent, who (as the officers knew) disliked the police, had 'real bad' schizophrenia, [] was not taking his medications, ignored the officers' demands that he drop the knife, … advanced toward them with his knife hand raised in a stabbing position [, and] announced – moments before the

12

shooting – 'you're going to have to kill me mother * * * *er,'" even if the suspect was 25 to 36 feet from officers. 945 F.3d at 982.

Plaintiff argues that *Reich* is distinguishable because the suspect was "walking at a fast pace toward officers" with his knife raised in a "stabbing position" and was much closer to officers than was Groom. The Court agrees that the holding in *Reich* does not "squarely govern" this case. However, there are enough similarities, that the Court cannot say that the unlawfulness of lethal force under the circumstances of this case was clearly established. The *Reich* court specifically noted that the distance between the suspect and officers is not dispositive of the reasonableness of deadly force. *Id*. at 982 (Noting that an assailant can close a 25-foot distance in a second or two, and "[t]here is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force,").

Notably, even the dissent in *Reich* stated that clearly established law is that "reasonable police officers do not shoot non-compliant persons brandishing knives when they are not advancing toward another individual in the immediate area, even if the person is mentally ill, suicidal, and/or yelling threats to the officers." *Id*. at 990 (Moore, J., dissenting). Here, the video evidence clearly shows Groom taking a step toward Russ.

Most recently, in considering an excessive force claim where an officer used a taser on an 81-year-old woman advancing toward him with a metal bow rake, the Sixth Circuit found no unreasonable use of force, stating that "where a person advances toward officers wielding a weapon, we have repeatedly concluded that *deadly* force is permissible, even in wellness check situations." *Erwin v. Greene Cty*., Case No. 20-6006, 2021 WL 2137782, at *4 (6th Cir. May 26, 2021) (emphasis in original). The facts in *Erwin* are obviously far removed from the facts in this

13

case. Nevertheless, the reasoning of the *Erwin* court indicates that Officer Russ did not violate clearly established law when he shot Groom, who was advancing toward him with a knife.

As stated in *Studdard* in determining whether an officer is entitled to qualified immunity, "[a]ll things considered, we construe uncertain facts in [plaintiff's] favor and uncertain law in the officers' favor." 934 F.3d at 481. Construing the facts in favor of Plaintiff, the law is not clearly established that the used of lethal force was unreasonable under the circumstances of this case. Accordingly, Officer Russ is entitled to qualified immunity.

## IV. CONCLUSION

For the reasons stated, Defendant Russ is entitled to qualified immunity. The Motion for Summary Judgment (Doc. No. 52) will be **GRANTED**. An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE